**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

LATIN MARKETS BRAZIL, LLC D/B/A MARKETS
GROUP,

                               Plaintiff

                                                18-cv-02089-GHW-RWL

-against-

PABLO OLIVEIRA,

                               Defendant.
-------------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**PABLO OLIVEIRA'S MOTION FOR SUMMARY JUDGMENT**


**RISMAN & RISMAN, P.C.**
By: Jeffrey Risman, Esq.
30 Vesey Street, 6th Floor
New York, NY 10007
(212) 233-6400

*Counsel for Defendant, Pablo Oliveira*

## TABLE OF CONTENTS                                                    Page

TABLE OF AUTHORITIES…………………………………………………………………ii, iii

PRELIMINARY STATEMENT…………………………………………………………….1

FACTUAL AND PROCEDURAL BACKGROUND

    I.      PARTIES…………………………………………………………………..2

    II.     EMPLOYEE OFFER LETTER DATED JANUARY 18, 2013…………………..2-3

    III.   MR. OLIVEIRA'S EMPLOYMENT BY LMB…………………………………..3-4

    IV.   LINKBRIDGE INVESTORS LLC……………………………………………...5

    V.    THE CURRENT LITIGATION…………………………………………………..5-6

ARGUMENT

    I.     STANDARD FOR GRANTING MOTION FOR SUMMARY JUDGMENT…...6-7

    II.    LMB'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED …………7-8

           A.  THE NON-COMPETITION CLAUSE IS UNENFORCEABLE…………….8-9

           B.  THE NON-SOLICITATION CLAUSE IS UNENFORCEABLE…………...10-11

    III.   LMB'S DATA IS NOT CONFIDENTIAL, PROPRIETARY OR A TRADE
          SECRET……………………………………………………………………11-13

           A.  LMB HAD NO SAFEGUARDS IN PLACE TO PROTECT ITS ALLEGED
              TRADE SECRETS……………………………………………………...13-14

    IV.   LMB'S ALLEGATION OF DAMAGES IS COMPLETELY SPECULATIVE...14-16

    V.    LMB LACKS EVIDENCE OF DAMAGES…………………………………16-17

    VI.   THE PARTIES NEVER AGREED TO LOST PROFITS IN THE EVENT OF A
          BREACH……………………………………………………………………17-18

    VII.  LMB'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS MUST BE
          DISMISSED………………………………………………………………...18-20

CONCLUSION………………………………………………………………………20

**TABLE OF AUTHORITIES**                                                      **Page**

**Cases**

*Aqualife Inc. Leibzon*, 50 Misc.3d 1206(A) (Sup.Ct Kings Co. 2016)…………………………8, 11

*Ashland Mgm't Inc. v. Janien,* 82 N.Y.2d 395, 405-406, 604 N.Y.S.2d 912 (1993)…...14, 18 - 19

*Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)……………………………………7

*Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364 (2015)………………………………………10

*Buchanan Capital Markets, LLC v. DeLucca*, 144 A.D.3d 508 (1ˢᵗ Dept. 2016)……………....10

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496 (1977)……………….....7

*Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009)……………………7, 16

*Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)……………...7

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)…………….6

*Furia v. Furia,* 116 A.D.2d 694 (2nd Dept. 1986)…………………………………………….....7

*Innoviant Pharmacy, Inc. v. Morganstern,* 390 F. Supp. 2d 179, 195 (N.D.N.Y. 2005)……….11

*Int'l Paper Co. v. Suwyn,* 966 F.Supp. 246, 256 (S.D.N.Y. 1997)………………………………12

*Kenford Co. v. County of Erie*, 67 N.Y.2d 257 at 261, 502 N.Y.S.2d 131 (1986)……………...14

*Kenford Co. v. County of Erie*, 73 N.Y.2d 312 at 319, 540 N.Y.S.2d 1 (1989)………………...17

*NBTY, Inc. v. Vigliante*, 2015 WL 7694865 (Suffolk Cty Sup. Ct. 2015)……………….........2

*Noise in Attic Productions, Inc. v. London Records,* 10 AD3d 303 (1st Dept. 2004)………….....7

**Page**

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, LLC, 813 F. Supp. 2d 489
(S.D.N.Y. 2011)……………………………………………………………………14

*Reed, Roberts Assocs, Inc. v. Strauman*, 40 N.Y.2d 303 (1976)……………………………..8, 12

*Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)………………………………….6

*Schonfeld v. Hilliard,* 218 F.3d 164, 172-73 (2d Cir. 2000)……………………………….18

*Walter Karl, Inc. v. Wood,* 137 A.D.2d 22, 27, 528 N.Y.S.2d 94, 98 (2d Dept. 1988)…………11

*Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010)…………………7

## Rules

Fed. R. Civ. P. Rule 26(a)(1)………………………………………………………………17

Fed. R. Civ. P. 30(b)(6)…………………………………………………………………13

Fed. R. Civ. P. 56(a)……………………………………………………………………6

## Other Authorities

N.Y. State Att'y Gen.'s Office, *Non-Compete Agreements in New York State* (2018),
https://ag.ny.gov/sites/default/files/non-competes.pdf…………………………………………7-8

Defendant Pablo Oliveira (hereinafter "Mr. Oliveira" or Defendant), submits this Memorandum of Law in Support of its Motion for Summary Judgment to dismiss Plaintiff Latin Markets Brazil's (hereinafter "LMB" or Plaintiff") breach of employment agreement and misappropriation of trade secret claims.

## PRELIMINARY STATEMENT

This case, at its core, concerns an employee offer letter, between LMB and Mr. Oliveira dated January 18, 2013.  The relevant facts in this case are not in dispute, and the alleged claims of breach of an employment agreement and misappropriation of trade secrets, should be dismissed as a matter of law.  As discussed in further detail below, Mr. Oliveira was required to sign an offer letter for an entry level position for $10.00 per hour, which contained numerous overbroad, invalid and unenforceable restrictive covenants.  The restrictive covenants were unreasonable, did not contain a geographic scope, and were an unlawful employee retention device.  Furthermore, the restrictive covenants are unenforceable since LMB's data was gathered using publicly available information, and therefore, LMB was not in the possession of information that was confidential, proprietary and/or a trade secret.  LMB has no evidentiary proof that Mr. Oliveira "stole" trade secrets prior to his resignation.  Finally, LMB has proffered no evidence that it suffered damages, as a result of Mr. Oliveira's alleged conduct.

<u>**FACTUAL AND PROCEDURAL BACKBROUND**</u>[1]

I.    <u>**PARTIES**</u>

Plaintiff Latin Markets Brazil, LLC D/B/A Markets Group ("LMB") is a limited liability company duly organized under the laws of the State of New York with its principal place of business at 44 East 32nd Street, New York, New York. Amended Complaint, at ¶ 1, Ex. A. Defendant Pablo Oliveira ("Mr. Oliveira") is an individual currently residing in Florida, and a former resident of New York State. See Ex. F, Oliveira Tr. pp. 4:14-15.

LMB is an executive forum provider. Amended Complaint, at ¶ 4, Ex. A.  Adam James Raleigh ("CEO" or "AJR") was LMB's Chief Executive Officer from 2009 through the present date. [2] Timothy John Raleigh ("CFO" or "TJR") is LMB's Chief Financial Officer.

II.    <u>**EMPLOYEE OFFER LETTER DATED JANUARY 18, 2013**</u>[3]

Mr. Oliveira signed a five page offer of employment, on LMB's letterhead, dated January 18, 2013. Employee Offer Letter ("Offer Letter"), Ex. C. The letter offered Mr. Oliveira compensation of $10.00 per hour.  The letter did not contain a list and/or description of Mr. Oliveira's job duties and responsibilities. Offer Letter at pg. 1, Ex. C.

---

[1] References to Deposition transcripts, page and line numbers are noted as follows: Timothy John Raleigh, Ex. D – TJR Tr. pp. 1:5-10; Adam James Raleigh, Ex. E  –  AJR Tr. pp. 1:5-10; Pablo Oliveira, Ex. F - Oliveira Tr. pp. 1:5-10.

[2] Prior to this litigation, AJR was sued by his former employer, and in settlement of that litigation, agreed not to contact past clients until his non-compete expired, and to return company work product that he removed. See Ex. E - AJR Tr. pp. 6:8-21, 7:9-13, 15:11-15, 19:4-13, 21:4-8.

[3] In the Amended Complaint, LMB mischaracterizes and disingenuously refers to the January 18, 2013 employee offer letter as an employment agreement.  As a matter of law, this letter was not an employment agreement, since the plain language of the letter states that it is "not intended…to be construed as creating a contract guaranteeing employment for any specific duration," and furthermore, there was no consideration exchanged between the parties.  See *NBTY, Inc. v. Vigliante*, 2015 WL 7694865 (Suffolk Cty Sup. Ct. 2015).

The letter stated the following:

> …is not intended to be and should not be construed as creating a contract guaranteeing employment for any specific duration. You understand and agree that the relationship between you and LMB is one of at will employment. Offer Letter at pg. 1, Ex. C.

The letter contained a list of covenants, including a "non-solicitation of clients and contacts" and a "non-competition" clause.  The letter did not contain a definition of the term "solicit," "competitor," "service," "duties," and/or "competition." Offer Letter at pgs. 3-4, Ex. C. The letter did not state and/or identify the compensation that Mr. Oliveira would receive in exchange for compliance with the above covenants. Offer Letter, Ex. C. The covenants did not state and/or identify a geographic scope. Offer letter, pgs. 3-4, Ex. C.

### III.    MR. OLIVEIRA'S EMPLOYMENT BY LMB

Mr. Oliveira was employed by LMB from January 2013 to September 2016. Declaration of Pablo Oliveira ("Oliveira Declaration") at ¶ 12. See Ex. F - Oliveira Tr. pp. 27:19-21.

During his employment at LMB, Mr. Oliveira used publicly available internet websites, Google and LinkedIn to perform his job and collect data (i.e individual's name, company name, telephone number, company address and email address).  Oliveira Declaration at ¶ 16. See Ex. F – Oliveira Tr. pp. 33:19 - 34:7, Ex. D - TJR Tr. pp. 80:23 - 81:4.

 LMB used competitor's lists to formulate its own customer lists.  In fact, LMB induced its employees to obtain competitor's lists and offered to pay them $200.00 for each list that was obtained.  ARJ email dated June 17, 2015, Ex. K, Ex. D - TJR Tr. pp. 83:9-21, Ex. E – AJR Tr. pp. 116:20-24, 119:3-11.

LMB's "customer lists" and data were stored and maintained on Excel spreadsheets. See Ex. F – Oliveira Tr. pp. 94:18-20.   The spreadsheets were not marked "confidential" or "proprietary." Oliveira Declaration at ¶ 15.

LMB did not provide a cell phone to Mr. Oliveira.  On certain occasions, he was required by LMB to use his personal cell phone to send emails, which included LMB data and "customer information."  See Ex. F – Oliveira Tr. pp. 115:12-15, 116:14-17, Ex. E – AJR Tr. pp. 163:22 – 164:5 (employees used their personal phones for work related e-mail).  These emails were not marked "confidential" or "proprietary." Oliveira Declaration at ¶ 16.

Mr. Oliveira never removed hard copies of LMB "customer lists" or other data or downloaded LMB "customer lists" or other data to his personal email, computer or any other electronic device, at any time during his employment with LMB.  See Ex. F – Oliveira Tr. pp. 114:14 -115:5, 117:2-15, Oliveira Declaration at ¶ 17.

Before he forwarded his notice of resignation to LMB, on September 22, 2016, TJR sent an email to Mr. Oliveira that stated that **"I will fucking kill you if you go to work with Will and Charles."**  Will and Charles were former LMB employees that started their own company. TJR email dated September 22, 2016, Ex. G, Oliveira Declaration at ¶ 19.

On September 23, 2016, Mr. Oliveira spoke to TJR about his resignation, and he was told that **"a non-competition clause is used to jam the person up,"** and that the cost to defend a non-compete lawsuit **"is going to hurt a person more than a company."** See Ex. D – TJR Tr. pp. 160:18-21, 162:9-16, Oliveira Declaration at ¶ 21.

In September 2016, Mr. Oliveira resigned from his position with LMB. Mr. Oliveira resignation letter, Ex. H, Oliveira Declaration at ¶ 18.

IV.     **LINKBRIDGE INVESTORS LLC**

On September 2016, Mr. Oliveira founded LinkBridge Investors LLC ("LinkBridge"), an investor relations company incorporated in the State of New York. See Ex. F – Oliveira Tr. 97:13-16, 98:18-21, Oliveira Declaration at ¶ 22.

In May 2018, LinkBridge ran their first conference, the Global Investor Annual Meeting. See Ex. F – Oliveira Tr. pp. 100:11-13, Oliveira Declaration at ¶ 23.   Prior to the event, Mr. Oliveira and his staff built lists of names for the event from Google and LinkedIn searches. See Ex. F – Oliveira Tr. pp. 139:18-25, Oliveira Declaration at ¶ 24.   Mr. Oliveira also purchased "lists and leads" from an outside company. See Ex F – Oliveira Tr. pp. 142:14-25.

Since Mr. Oliveira did not have hard copies or electronic copies of LMB's "customer lists" or other data in his possession or control, he did not use them to build lists of names and contact information for the May 2018 event or any other event. See Ex. F – Oliveira Tr. pp. 114:14 - 115:5, Oliveira Declaration at ¶ 25.

LMB has no exclusive contracts with any of its alleged "clients" (i.e. sponsors).  See Ex. D – TJR Tr. pp. 175:25 - 176:3.

V.     **THE CURRENT LITIGATION**

On January 10, 2018, LMB commenced a lawsuit against Mr. Oliveira in Supreme Court, New York County alleging two causes of action; a) non-competition; and b) non-solicitation.  On or about March 8, 2018, Mr. Oliveira filed a Notice of Removal for the Supreme Court action to be removed to the United Stated District Court of the Southern District of New York. Docket Entry 1.

On or about June 8, 2018, LMB filed an Amended Complaint alleging two causes of action; (a) breach of employment agreement and b) misappropriation of trade secret. Amended Complaint, Ex. A.  On or about June 13, 2018, Mr. Oliveira filed an Amended Answer denying the material allegations of the Amended Complaint. Amended Answer, Ex. B.

Pursuant to the Court's scheduling order, all discovery was to be completed on March 15, 2019. Docket Entry 38.

According to the Amended Complaint, for each cause of action, Plaintiff suffered damages in an amount not less than $400,000.00. Amended Complaint at ¶¶ 24, 28, Ex. A.  LMB could not provide a damages calculation for a violation of the non-solicitation and the misappropriation of trade secrets claims in the Amended Complaint. See Ex. D – AJR Tr. pp.145:23 - 146:6, 194:3-7.

LMB has no evidence Mr. Oliveira took hard copies of customer lists, and/or downloaded customer lists to his personal email or any electronic device during his employment with LMB. See Ex. E – AJR Tr. pp. 143:4-7.

## ARGUMENT

### I.       STANDARD FOR GRANTING MOTION FOR SUMMARY JUDGMENT

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)). "The moving party bears

the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence…on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) "and 'may not rely on conclusory allegations or unsubstantiated speculation.'" Id. (quoting *Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

## II.   LMB'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED

Under New York law, in order to prevail on a breach of contract claim, a plaintiff must establish all of the following four elements: (1) the existence of a valid contract; (2) plaintiff's performance of the contract; (3) defendant's material breach of the contract; and (4) resulting damages. *See e.g., Noise in Attic Productions, Inc. v. London Records,* 10 AD3d 303 (1st Dept. 2004); *Furia v. Furia,* 116 A.D.2d 694 (2d Dept. 1986).  As set forth below, LMB cannot establish the above elements of breach of contract, including but not limited to, its completely unsupported claim for damages.

Restrictive covenants which prevent or limit an employee from pursuing a similar vocation after termination of employment are disfavored by the law. *See Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496 (1977). In 2018, the New York State Attorney General investigated numerous companies for egregious misuse of restrictive covenants concerning low wage employees, like Mr. Oliveira. Barbara D. Underwood, N.Y. State Att'y Gen.'s Office, *Non-*

*Compete Agreements in New York State* (2018)[4]. To be enforceable, these clauses must be reasonably related as to time and geographical scope, and not unreasonably burdensome. *See Reed, Roberts Assocs, Inc. v. Strauman*, 40 N.Y.2d 303 (1976).  In this case, the restrictive covenants contained no geographical limit, and therefore were unenforceable.  In *Aqualife Inc. v. Leibzon*, the Court held that "the unlawful restrictive covenants appl[ied] to the entire country and even other countries in the world… imposed an undue hardship on the individual defendants … prohibited from selling any similar water products to anyone anywhere in the world." See *Aqualife Inc. Leibzon*, 50 Misc.3d 1206(A) (Sup. Ct Kings Co. 2016).

### A.  <u>THE NON-COMPETE IS UNENFORCEABLE</u>

This non-competition clause, which was intended to unlawfully bind a low wage worker, is overly broad, lacked any specificity, is invalid and unenforceable.[5]  It was not designed to protect trade secrets, but to serve as an unlawful employee "retention device," as evidenced by LMB's egregious conduct.  On September 22, 2016, before Mr. Olioveira resigned, TJR sent an email to Mr. Oliveira that said that **"I will fucking kill you if you go to work with Will and Charles."**  Will and Charles were former LMB employees that started their own company. TJR email dated September 22, 2016, Ex. G, Oliveira Declaration at ¶ 19.  On September 23, 2016, Mr. Oliveira spoke to TJR about his resignation and his future plans and TJR told him that **"a non-competition clause is used to jam the person up."**  TJR also told Mr. Oliveira that the money to defend a non-compete lawsuit **"is going to hurt a person more than a company."** See Ex. D – TJR Tr. pp. 160:18-21, 162: 9-16, Oliveira Declaration at ¶ 21.

---

[4] https://ag.ny.gov/sites/default/files/non-competes.pdf
[5] The clause states "you will not…, render any service, ... related to the duties you performed for the Employer (or as they may change from time to time) to any business…, which is in competition with the Employer." Offer Letter at pg. 4, Ex C.

The offer letter and the non-competition clause were mere boilerplate, overly broad, without any specificity, and therefore, were unenforceable.  The letter did not list Mr. Oliveira's job duties, did not describe the services that he would perform, and did not contain a job description. Offer Letter at pgs. 1-4, Ex. C.  Although the letter contained a non-competition clause, there was no definition of "competitor". Offer Letter at pg. 4, Ex. C.  The non-competition clause did not describe or explain the terms "service," "duties," and/or "competition."  Offer Letter pgs. 2-4, Ex. C.  There was no definition, as to what type of business was in competition with LMB. Offer Letter at pg. 4, Ex. C.  At the time he was hired, Mr. Oliveira had no conceivable idea as to the total number and which potential employers and industries were prohibited.

Moreover, TJR concedes that he has absolutely no idea as to who are LMB's competitors.[6] During his deposition, he had serious trouble identifying LMB's competitors.

"… that it is a hard question to answer, because what constitutes a competitor. Is it someone that does similar events? Is it someone just organizing events? Is it somebody that is organizing events that may draw the same type of targets? Is it the individual who's just doing one or two events per year which may pull revenue?" See Ex D - TJR Tr. pp. 67:12-19.

This testimony is crucial, and leads to the reasonable conclusion, that if LMB does not know who its own competitors are, how can Mr. Oliveira, an entry level intern be expected to know the meaning of the non-competition clause at the time of hire, and be held to have violated this provision.

---

[6] AJR also could not testify as to how many companies LMB competed against. See Ex E - AJR Tr. pp. 147:2-13.

## B.  <u>THE NON-SOLICITATION CLAUSE IS UNENFORCEABLE</u>

The non-solicitation clause was also overly broad and unenforceable, since it failed to include Mr. Oliveira's job description, or list his specific duties and "services," [7] and improperly applied to "clients" who he had "access" to allegedly "confidential and proprietary information," during the course of his employment.   Based upon this language, Mr. Oliveira would be unreasonably prohibited from soliciting thousands of investors, sponsors, delegates, speakers, investment companies, suppliers, and vendors, which would be an undue hardship, and prevent him from gainful employment in the industry.   See Ex. E – AJR Tr. pp. 148:8-10 (over 1000 potential targeted sponsors), 148:20 - 149:3 (over 1000 investors).   In *Brown & Brown, Inc. v. Johnson*, the Court held that "under New York law, the restrictive covenant was overbroad to the extent that it prohibited the [employee] from working with any of plaintiffs' New York customers, even those [he] had never met, did not know about and for whom she had done no work." [8] Likewise, Mr. Oliveira would be barred from soliciting "clients" he had never met, did not know about, and for whom he did no work.   He should not be prevented from making a living, based upon the mere fact that LMB had an exhaustive database containing thousands of names, which were publicly available, and not trade secrets.

In *Buchanan Capital Mkts., LLC v. DeLucca*, the Court held that: "Unless plaintiff's predecessor's clients signed agreements to use plaintiff's predecessor for a set period of time –and there is no indication in the record that they did – the clients should be free to pick the firm they want, be it plaintiff of defendant's new firm." [9]   In the instant case, LMB had no exclusive contracts

---

[7] The clause allegedly prohibits "solicit [ing] the business of or perform[ing] any services for any Client of the Employer related to the services you performed for the client or for the employer." Offer Letter at pgs. 3-4, Ex. C.
[8] *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364 (2015).
[9] *Buchanan Capital Markets, LLC v. DeLucca*, 144 A.D.3d 508 (1st Dept. 2016).

with any of its alleged "clients." See Ex. D – TJR Tr. pp. 175:25 - 176:3.  Therefore, in this case, the "clients" were free to use Mr. Oliveira's services, after he left LMB's employment.

Furthermore, the non-solicitation clause was overbroad since LMB's customer lists were not "confidential and proprietary information."  In *Aqualife Inc. v. Leibzon*, the Court stated that where "customer names are readily ascertainable from sources outside its business, trade secret protection will not attach and their solicitation by the employee will not be enjoined." TJR acknowledged that customer information is obtained through publicly available resources such as LinkedIn and Google searches, therefore the "client lists" were not confidential trade secrets. See Ex. D – TJR Tr. pp. 80:23 - 81:4.

### III.   LMB'S DATA IS NOT CONFIDENTIAL, PROPRIETARY OR A TRADE SECRET

Although LMB appears to allege that its' publicly available "customer data" (i.e. names, company, phone number and email address), and the preferences concerning these "customers" are trade secrets, LMB's allegations are unsupported by well-established case law. *Innoviant Pharmacy, Inc. v. Morganstern,* 390 F. Supp. 2d 179, 195 (N.D.N.Y. 2005) (where referral sources are readily ascertainable from publicly available sources including the Internet, Yellow Pages, and the membership lists of various professional organizations providing services in those areas, the customer information does not possess the attributes of a trade secret); *Walter Karl, Inc. v. Wood,* 137 A.D.2d 22, 27, 528 N.Y.S.2d 94, 98 (2d Dept. 1988) ("An employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential.").

Mere 'knowledge of the intricacies of a [former employer's] business operation' does not constitute a protectable trade secret that would justify prohibiting the employee 'from utilizing his

knowledge and talents in this area.' *Int'l Paper Co. v. Suwyn*, 966 F.Supp. 246, 256 (S.D.N.Y.1997) (quoting *Reed Roberts*, 386 N.Y.S.2d at 680, 353 N.E.2d 590).

The record evidence establishes that the restrictive covenants are overly broad and unenforceable because LMB's customer lists and other data is derived from publicly available information.  TJR testified that this information was gathered from internet searches.  Of particular note, TJR and AJR testified to the following:

- The information that is included in LMB's customer lists is publicly available. See Ex. D – TJR Tr. pp. 79:21-23.

- LMB's Investor Relations and Sales Department get the bulk of their data from LinkedIn searches.  See Ex. D – TJR Tr. pp. 73:3-10.

- LinkedIn is the sole resource in terms of developing LMB's customer lists and that the information included in LMB's customer list is publicly available. See Ex. D - TJR Tr. pp. 74:3-7, 75:2-6.

- The information which is on LinkedIn is publicly available. See Ex. D – TJR Tr. pp. 75:2-6.

- LMB used competitor's information and data to formulate its own customer lists. In fact, LMB induced its employees to obtain competitor's lists and offered $200.00 for each list that was obtained. See Ex. D - TJR Tr. pp. 83:9-21, Ex. E – AJR Tr. pp. 116:20-24, 119:3-11.

- In order to locate people for events, a search is done in Google and LinkedIn. See Ex. D – TJR Tr. pp. 80:23 - 81:2-4.

- LMB also obtains names and contact information from "outsource firms," and "anyone can use these firms." See Ex. D - TJR Tr. pp. 94:20-22.

- LMB testified that its data is **generally known to other employers and individuals not employed by the company**.  In fact, individual's names, email, company address and phone numbers can be located on Google and LinkedIn. See Ex. D - TJR Tr. pp. 106:21-23, 107:9-23, 108:17-23.

- LMB testified than even an attorney, with no event organizing experience can look for potential sponsors based upon doing a Google search. Ex. D - TJR Tr. pp.

112:7-14.  LMB marketing brochures can be used by anyone, to find people "who are on target." See Ex. D - TJR Tr. pp. 113:16-19.

Accordingly, there is irrefutable evidence, including the dispositive testimony of TJR and AJR, LMB's two chief executives and its only Fed. R. Civ. P. 30(b)(6) witnesses, which has been corroborated by Mr. Oliveira, that LMB's customer names and other data was publicly available, and generally known to other employees and individuals outside the company. See Ex. F – Oliveira Tr. pp. 33:19 - 34:7, Oliveira Declaration at ¶ 16.  Therefore, LMB did not possess confidential and proprietary information, or a trade secret, and the restrictive covenants are unenforceable.

## A.  LMB HAD NO SAFEGUARDS IN PLACE TO PROTECT ITS ALLEGED TRADE SECRETS

As further proof that LMB's causes of action must be dismissed, the overwhelming evidence establishes that LMB's customer names and data were not protected as trade secrets, and not kept in a confidential manner.  In fact, TJR admitted that employees were allowed to, and did in fact, email customer lists to their own personal email account.  See Ex. D – TJR Tr. pp. 132:3-6.  Accordingly, by allowing employees to commingle both personal information and customer lists, in their own email accounts, there could not, and was no reasonable expectation for employees to believe that this information was confidential.

Furthermore, the customer lists and data were maintained in excel lists that were available to nearly all employees in the company (i.e. the sales department and the investor relations department, therefore, there were no efforts to restrict the availability of this information). See Ex. D - TJR Tr. pp. 21:2-5, 21:22-24.  TJR further testified to serious deficiencies in LMB's security measures, "the only method to secure the buy side data was the manager, who had to ensure, that that it only goes to people who need it." See Ex. D - TJR Tr. pp. 28:5-8.  TJR conceded that while

13

LMB employed Mr. Oliveira, between 2013 and 2016, that LMB did not have the "technical budget" for the necessary security measures to prevent someone from "stealing" or moving a customer list from LMB's database. See Ex. D – TJR Tr. pp. 228:16 – 229:9.

Of particular note, and conclusive proof that LMB's customer lists were not trade secrets, is the unquestionable fact that anyone attending a LMB conference had the ability to meet LMB's alleged "clients," and obtain all contact information, including but not limited to, individual names and company information.

IV.   **LMB'S ALLEGATION OF DAMAGES IS COMPLETELY SPECULATIVE**

 Breach of contract and misappropriation of trade secrets claims will be dismissed where the damages are speculative. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, LLC, 813 F. Supp. 2d 489 (S.D.N.Y. 2011).  The claimed damages may not be "speculative, possible, imaginary, … remote, or the result of other intervening causes." *Kenford Co. v. County of Erie*, 67 N.Y.2d 257 at 261, 502 N.Y.S.2d 131 (1986).  They must instead be directly traceable to the breach. *Id.*  They need not be determined with absolute certainty or mathematical precision, but they must be susceptible to measurement based on known reliable factors without undue speculation. *Ashland Mgm't Inc. v. Janien,* 82 N.Y.2d 395, 405-406, 604 N.Y.S.2d 912 (1993).

The undisputed evidence, as testified by TJR is that LMB has not experienced any adverse financial effects, due to Mr. Oliveira's alleged conduct.  Instead, LMB has grown its business since Mr. Oliveira left his employment in 2016.  According to TJR from 2013 to 2016, LMB hosted 25 to 50 conferences per year. See Ex. D - TJR Tr. pp. 34:7-9.  Thereafter, in 2017, LMB increased the number of conferences to approximately 55 and 65 conferences. See Ex. D - TJR Tr. pp. 35:12-14.  In 2018, LMB further expanded its business, and did approximately 65 conferences. See Ex. D - TJR Tr. pp. 35:15-16.  For 2019, LMB had approximately 70 conferences scheduled. See Ex.

D – TJR Tr. pp. 35:21-23.  The upsurge in conferences each year has resulted in increased revenue and profits every year. See Ex. D - TJR Tr. pp. 35:24 - 36:2.

Although LMB appears to argue without any support that that they suffered damages as a result of Mr. Oliveira's event held in May 2018, LMB has no evidence that Mr. Oliveira's event in May 2018, was a profitable event.

LMB acknowledged that not all conferences are successful, and that LMB did not achieve its revenue goals for each and every event between 2013 and 2016, during Mr. Oliveira's employment. See Ex. D - TJR Tr. pp. 57:15-17.  Furthermore, LMB conceded that not every event held between 2017 to the present hit its forecast. See Ex. D – TJR Tr. pp. 61:21 - 62: 2.  In fact, only 70% of LMB's events are successful and achieve their revenue goals. See Ex. D - TJR Tr. pp. 58:24 - 59:3.  Accordingly, based upon the uncertain profitability of these events, LMB cannot establish that it lost any money as a result of Mr. Oliveira's events.

Moreover, TJR acknowledged that regardless of Mr. Oliveira's alleged conduct, LMB could still attract the same speakers and investors to attend LMB's events. See Ex. D - TJR Tr. pp. 175:5-9.  There is no evidence that LMB had an exclusive contract with any speakers, sponsors, investors, delegates, etc. which would prohibit or prevent any individual from attending a particular event in the future.

LMB's additional damage "theories" are not supported by factual evidence, and are wholly speculative.  TJR surmised that "anyone that went to his [Mr. Oliveira's] event versus ours [LMB's] did detract from the quality of our event and …boosted the quality of his event." See Ex. D - TJR Tr. pp. 175:9-12.  LMB relies solely on speculation and cannot quantify a monetary amount of lost revenue.  See Ex. E - AJR Tr. pp. 109:8-11.  Furthermore, LMB has no expert evidence or testimony in support its conclusions.  Equally unavailing is LMB's theory that any

sponsor that attended Mr. Oliveira 's event was unlikely to attend LMB's events, because these companies do not have unlimited budgets. See Ex. D - TJR Tr. pp.175:19-24.  There is a fatal flaw to LMB's conclusion, since LMB acknowledged that there is an overlap between the sponsors and investors who attend LMB and its competitor's events, and investors do not pay to come to events. See Ex. D - TJR Tr. pp. 176:12-19, Plaintiff's Response to Defendant's First Set of Interrogatories, at Interrogatory No. 3, Ex. J.

LMB did not proffer evidence in support of Mr. Oliveira's alleged violation of the restrictive covenants.  Without any evidence, LMB speculates that "a real estate event of that magnitude must have required at least a year of preparation." See Ex. D - TJR Tr. pp. 199:11-15. LMB further speculates, without evidentiary proof, that "it's simply impossible for one person to put that event together in the matter of a few months from the expiration" of the restrictive covenants. See Ex. D - TJR Tr. pp. 199:21-24.  Since there are a myriad of variables that could affect the overall revenue for each conference, LMB cannot establish that it would have made the same, more or less than the event conducted by Mr. Oliveira. See Ex. D – TJR Tr. pp. 213:3-6. Although LMB alleges that Mr. Oliveira solicited "clients" to participate in competing events, TJR testified that he did not know whether these "clients" were still "clients" working with LMB after Mr. Oliveira resigned. See Ex. D - TJR Tr. pp. 215:25 - 216:5.

## V.   **LMB LACKS EVIDENCE OF DAMAGES**

When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence…on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

In this case, although the Amended Complaint alleged $800,000.00 in damages, LMB has not supported this allegation with evidentiary proof.  See Ex. D - TJR Tr. pp. 219:8-13.  LMB has not produced any evidence whatsoever that it has suffered damages as a result of the unproven misappropriation of trade secrets or breach of contract claims. See Ex. E – AJR Tr. pp. 112:9-12. (when AJR was asked how he came to the calculation of hundreds of thousands of dollars in damages – he vaguely alleged "based on my professional opinion, being in the industry"). Although LMB was legally obligated to investigate the damages it sustained prior to the commencement of this litigation, it failed to do so, and as of the date of this motion, has never detailed and/or itemized its damages.  In fact, LMB failed to produce evidence of damages, as required by Fed. R. Civ. P. Rule 26(a)(1), Mr. Oliveira's Request for Documents and Mr. Oliveira's First Set of Interrogatories. Plaintiff's Fed. R. Civ. P. Rule 26 (a)(1) Initial Disclosure, Ex. I at, Plaintiff's Response to Defendant's First Set of Interrogatories, Ex. J.  In LMB's Initial Disclosure, Plaintiff stated that it "will not be able to provide a computation of damages" until after it conducts discovery. Ex. D – TJR Tr. pp. 171:2-10, Ex. I at §3.

To date, despite depositions and "paper discovery" being complete, LMB has still not produced a computation of damages, and testified that damages were still being analyzed. See Ex. D - TJR Tr. pp. 119:17-22, 172:20-25.


## VI.   THE PARTIES NEVER AGREED TO LOST PROFITS IN THE EVENT OF A BREACH

Courts take a "common sense" approach to determining whether damages were within the reasonable contemplation of the parties, by considering the nature, purpose and particular circumstances of the contract known by the parties, as well as the risks that defendant foresaw or should have foreseen at the time of contract. *Kenford Co. V. County of Erie*, 73 N.Y.2d 312 at 319,

540 N.Y.S.2d 1 (1989); *Ashland,* 82 N.Y.2d at 403, 604 N.Y.S.2d 912 (1983); *see Schonfeld v. Hilliard,* 218 F.3d 164, 172-73 (2d Cir. 2000).

It is undisputed that the offer letter did not state that in the event of a breach, the breaching party would be liable for lost profits. Instead, injunctive relief was the sole remedy agreed upon by the parties.

The offer letter stated the following:

"you agree that in the event of a breach…, the Employer shall be entitled to injunctive relief…to remedy any such breach…, and you acknowledge that damages would be inadequate and insufficient." Offer Letter at pg. 4, Ex. C,

LMB never moved for injunctive relief, and the alleged restrictive covenant period has expired. LMB drafted the offer letter, without the assistance or negotiation by Mr. Oliveira, which stated that this was the "entire understanding of the parties." Offer Letter at pg. 4, Ex. C,

## VII.   LMB's CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS MUST BE DISMISSED

In order establish a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir. 1990).

In determining whether information constitutes a trade secret, New York courts have considered the following factors[10]: (1) the extent to which the information is known outside of the

---

[10] In determining whether matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g., such as by stealing or copying. *Ferranti Elec., Inc. v. Harwood,* 43 Misc.2d 533, 251 N.Y.S.2d 612, 619–620 (Sup.Ct. Nassau County 1964). Of particular note, LMB testified that it induced its employees

business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Ashland Mgm't Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912 (1993).

LMB cannot sustain the allegations in its claim: a) that it possesses valuable trade secrets, one of which is its customer lists; b) that Mr. Oliveira had access to such customer lists and used such lists after his departure from LMB; and c) that LMB has suffered and continues to suffer damages. First, LMB's customer lists are not trade secrets since all the information contained in said lists is publicly available (i.e. name, address, phone number, email address).  Next, this information was not treated by LMB as a protected trade secret, in that almost every staff member had access to this data on a daily basis, that this data was not stamped or identified as confidential, and that any individual that attended LMB's events could learn the identity of LMB's clients or by simply accessing the company's website.

Even if these lists are trade secrets, which they are not, this claim must still fail since LMB has no proof that Mr. Oliveira made physical or electronic copies of these lists, downloaded these lists to his personal email, or copied these lists to any device.  LMB's sole support for misappropriation is its CEO's "personal belief" that Mr. Oliveira could not create a customer list alone. See Ex. E - AJR Tr. pp. 178:21 – 179:2.

---

to obtain competitor's lists in exchange for a payment of $200.00 per list. See Ex. D - TJR Tr. pp. 83:9-21, Ex. E – AJR Tr. pp. 116:20-24, 119:3-11.  Accordingly, it is completely disingenuous for LMB to allege that Mr. Oliveira misappropriated its trade secrets, when it induced its own employees to steal and/or copy competitor's lists.

LMB did not proffer any evidence that Mr. Oliveira removed or stole information from LMB's workplace or used misappropriated information.  TJR was unable to identify any evidence that Mr. Oliveira inappropriately removed LMB's confidential information. See Ex. D - TJR Tr. pp. 120:7 - 121:4.  In fact, at his deposition, TJR testified that he still had to review his files, but he could not identify what files he intended to review. See Ex. D - TJR Tr. pp. 120:7 - 121:4. Further, TJR could not recall a single situation or instance in which Mr. Oliveira sent confidential information to his personal email address. See Ex. D - TJR Tr. pp. 130:14-20.  Based upon this lack of evidence that Mr. Oliveira "stole" information, TJR desperately and ambiguously alleged that there was an "overlap of customers" and that it would take Mr. Oliveira six months to create customer lists on his own. See Ex. D - TJR Tr. pp. 221:4-13.

## CONCLUSION

For all the foregoing reasons, Mr. Oliveira respectfully requests that the Court enter an order: (1) granting Mr. Oliveira's Motion for Summary Judgment; (2) dismissing the First and Second Cause of Action of LMB's Amended Complaint (i.e. Breach of Employment Agreement and Misappropriation of Trade Secrets Claims); and (3) granting all other relief to which Mr. Oliveira is entitled.

Dated: New York, New York
April 29, 2019

Respectfully submitted,

RISMAN & RISMAN, P.C.

Jeffrey Risman, Esq.
Attorneys for Defendant
30 Vesey Street, 6th Floor
New York, NY 10007
(212) 233-6400