UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_2/3/2020____

-----------------------------------------------------------X

MARKETS GROUP, INC.              :

                                         :     18 Civ. 2089 (GHW) (RWL)

                                         :

                      Plaintiff,      :    **REPORT AND RECOMMENDATION**

                                         :    **TO HON. GREGORY H. WOODS:**

                                         :    <u>**SUMMARY JUDGMENT**</u>

              - against -        :

                                         :

PABLO OLIVEIRA,             :

                                         :

                      Defendant.     :

-----------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Markets Group, Inc. ("Plaintiff" or "Markets") filed this action for breach of contract and misappropriation of trade secrets against Defendant Pablo Oliveira ("Defendant" or "Oliveira"), Plaintiff's former employee. Presently before this Court is Defendant's motion for summary judgment, which seeks dismissal of all claims. (Dkt. 58). For the reasons that follow, this Court recommends that Defendant's motion be GRANTED and Plaintiff's case be dismissed in its entirety.

## Factual Background

Markets is an "executive forum provider" that organizes conferences both domestically and internationally. Markets issued a letter offer of employment to Oliveira on January 18, 2013, which he signed approximately five days later.[1] (Complaint ¶ 4; Dkt. 48-1 ¶ 5; Dkt. 49-3 (the "Letter Agreement").) In the Letter Agreement, Markets

---

[1] The Letter Agreement indicates that Oliveira actually signed the agreement on January 23, 2012, approximately one year before Markets issued it. As the Court is not aware of any debate over the authenticity of Oliveira's signature or whether Oliveira actually served as Markets' employee between January 2013 through September 2016, this Court assumes that Defendant actually signed the letter offer on January 23, 2013.

stated that Oliveira was being hired as an "Associate," that his compensation would be $10.00 per hour, and that he would be eligible to receive "annual discretionary incentive bonuses" at Markets' discretion. (Dkt. 49-3 at 1.) The Letter Agreement also listed certain "covenants" that employees entered into upon signing the offer of employment. These included a "non-solicitation of clients and contacts" covenant and a "non-competition" covenant. (*Id.* at 4.) The Letter Agreement further stated that employees are subject to a "duty of confidentiality" with respect to "trade secrets and confidential and proprietary information" encountered during employment. (*Id.* at 2-5.) The term "confidential and proprietary information" is defined in the Letter Agreement to include, among other things, "[a]ny and all trade secrets" and "[c]lient and contact lists of [Markets] and its affiliated entities." (Dkt. 49-3 at 3.)

Oliveira worked for Markets as an Associate from January 2013 through September 2016. (Defendant's Undisputed Statement of Material Facts Pursuant to Local Rule 56.1 ("Defendant's 56.1 Statement") (Dkt. 57) at ¶ 11.) Oliveira's responsibilities included "[b]uilding Excel lists, cold calling, researching online to find names and people" and selling life insurance. (Dkt. 61-6 at 8:13-24; 16:5.) The Excel lists consisted of "leads, people, companies" to whom Markets could sell insurance. Both Markets and Oliveira refer to these Excel spreadsheets as "customer lists." (Defendant's 56.1 Statement ¶ 14; Deposition of Timothy John Raleigh ("TJR Depo.") (Dkt. 61-4) at 71:18-21; Deposition of Adam James Raleigh ("AJR Depo.") (Dkt. 61-5) at 68:3-10.)

To build the customer lists, Oliveira consulted "publicly available internet websites" like Google and LinkedIn and collected relevant data (*i.e.*, potential customers' names, telephone numbers, company addresses, and email addresses). (Defendant's 56.1

Statement ¶ 12.) At times, Markets also obtained contacts from similar lists compiled by its competitors to formulate, and incentivized its employees to obtain competitors' lists by paying them $200.00 for each one obtained. (*Id.* ¶ 13.)

The customer lists were not marked "confidential" or "proprietary." (*Id.* ¶ 14.) And, as Markets did not provide Oliveira with a cell phone, Oliveira was, at times, required to use his personal cell phone to send work-related emails, some of which included "Plaintiff data and 'customer information.'" (*Id.* ¶ 15.) Like the customer lists, work-related emails sent from Oliveira's personal cell phone were not marked "confidential" or "proprietary." (*Id.*)

On September 22, 2016, Timothy John Raleigh, Plaintiff's Chief Financial Officer, sent an email to Oliveira that read, "I will fucking kill you if you go to work with Will and Charles," former Markets' employees who had since started their own company. (*Id.* ¶ 17; Dkt. 61-7.) On September 23, 2016, Raleigh told Oliveira "that 'a non-competition clause is used to jam the person up' and that the cost to defend a non-compete lawsuit 'is going to hurt a person more than a company.'" (Defendant's 56.1 Statement ¶ 18.) That same day, Oliveira emailed his resignation to Raleigh. (Defendant's 56.1 Statement ¶ 19; Dkt. 61-8.)

Later that month, Oliveira incorporated LinkBridge Investors LLC ("LinkBridge") in the State of New York. (*Id.* ¶ 20.) Oliveira intended LinkBridge to service "investor relations," which meant that Oliveira "would reach out to investors so they could be introduced a specific amount of meetings to some managers." (Deposition Transcript of Pablo Oliveira ("Oliveira Dep.") (Dkt. 61-6) at 98:21-25, 99:2-9.) Oliveira made the

decision that LinkBridge would run a "conference event," however, because "there wasn't enough revenue coming in through investor relations" alone. (*Id.* at 100:14-20.)

Oliveira's LinkBridge ran its first event in May 2018, approximately eight months after Oliveira resigned from his position with Markets. (Defendant's 56.1 Statement ¶ 21.) Prior to that event, Oliveira and his staff compiled invitation lists by using public websites like Google and LinkedIn, the same websites Oliveira had consulted to build customer lists while under Markets' employ, and by purchasing "lists and leads" from an outside company. (*Id.* ¶ 22-23.) Oliveira did not possess hard copies or electronic copies of Markets' customer lists and did not use them to build the invitation lists used for LinkBridge's first conference in May 2018 (or for any subsequent events). (*Id.* ¶ 24.)

### Procedural History

Markets initially filed a complaint in the Supreme Court, New York County on January 10, 2018, alleging that Oliveira had breached the non-competition and non-solicitation covenants of his employment contract. (*Id.* ¶ 25; *see also* Dkt. 1-1.) On March 8, 2018, Oliveira filed a Notice of Removal to this Court. (Dkt. 1.) Following removal to this Court, Markets filed an Amended Complaint (which remains the operative complaint) on June 8, 2018. (Dkt. 17.)

The amended complaint asserts two causes of action: (1) breach of Oliveira's employment agreement; and (2) misappropriation of trade secrets. (Defendant's 56.1 Statement ¶ 26; Dkt. 1, Ex. A.). Markets alleges that it suffered damages of an amount not less than $400,000. (Defendant's 56.1 Statement ¶ 30.) On June 13, 2018, Defendant filed its answer to the amended complaint. (Defendant's 56.1 Statement ¶ 27; Dkt. 18.)

On April 29, 2019, following the conclusion of discovery, Oliveira filed the instant motion for summary judgment.[2] (Dkt. 58.) On June 26, 2019, Markets filed its opposition papers, along with three supporting declarations. (Dkts. 67-69.) On June 24, 2019, Oliveira filed his reply in further support of its motion. (Dkt. 62.)

This matter was initially referred to the undersigned by the Honorable Gregory H. Woods, U.S.D.J., for general pre-trial management on April 9, 2018. (Dkt. 10.) On April 11, 2019, Judge Woods additionally referred this dispositive motion to the undersigned for a Report and Recommendation. (Dkt. 47.)

## Legal Standard

A "[c]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court's task is not to resolve contested issues of fact, but rather to determine whether there exists any disputed issue of material fact. *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987). "A fact is material when it might affect the outcome of the suit under governing law." *Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 421 Fed. Appx. 97, 101 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)) (internal quotation marks omitted). A dispute "is 'genuine' . . . if

---

[2] Defendant's April 29, 2019 filings were rejected by the Office of the Clerk due to technical errors with the document uploads, and Defendant subsequently refiled them on June 29, 2019. (Dkt. 57-63.) The Court refers to those revised filings as the relevant papers for purposes of this motion.

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *F.D.I.C. v. Great American Insurance. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Celotex Corp.,* 477 U.S. at 323). Once this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson*, 477 U.S. at 249). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party." *Okin v. Village of Cornwall-On-Hudson Police Department*, 577 F.3d 415, 427 (2d Cir. 2009) (*quoting Horvath v. Westport Library Association*, 362 F.3d 147, 151 (2d Cir. 2004)) (internal quotation marks omitted). However, "[t]o defeat a summary judgment motion, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Great American Insurance Co.,* 607 F.3d at 292 (citations omitted) (first *quoting Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), then *quoting Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (internal citations omitted); *see also Knight*, 804 F.2d at 11-12.

**Discussion**

## A. Markets Is Not Entitled to Further Discovery in Aid of Opposing Summary Judgment

Before discussing the substantive claims, the Court first addresses Markets' argument that the instant motion for summary judgment should be denied in order to permit additional discovery, specifically obtaining responses to interrogatories, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

As a preliminary matter, Markets incorrectly invokes Rule 56(f). In 2010, Rule 56(d) was amended to "carry[ ] forward without substantial change the provisions of former subdivision (f)," which allows a party to "seek an order deferring the time to respond to the summary judgment motion." Fed. R. Civ. P. 56(d) Advisory Committee's Note to 2010 Amendment; 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2740 (4th Ed.) ("precedent prior to 2010 citing Rule 56(f) is fully applicable to current Rule 56(d).") The Court construes Plaintiff's request for relief under Rule 56(f) as one properly made under Rule 56(d).

A party requesting relief under Rule 56(d) must explain "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc v. Department of the Navy*, 891 F.2d 414, 422 (2d Cir. 1989). The Second Circuit has repeatedly denied requests for additional discovery under Rule 56(d) when presented

7

with affidavits that contain "only conclusory allegations of incomplete discovery." *See Lunts v. Rochester City School District*, 515 Fed App'x. 11, 13-14 (2d. Cir. 2013) (affirming district court's denial of additional discovery under Rule 56(d) where the affidavit submitted in support "contained only conclusory allegations of incomplete discovery" and failed to identify "any potentially discoverable evidence that would have raised a genuine issue of material fact"); *see also Alphonse Hotel Corporation v. Tran*, 828 F.3d 146,151-52 (2d Cir. 2016) (affirming denial of additional discovery under Rule 56(d) where affidavit submitted in support failed to explain affiant's "basis for believing that these documents exist" as "[s]uch bare, generalized assertions cannot justify delaying the resolution of a summary judgment motion"); *Seneca Beverage Corp. v. Healthnow New York, Inc.*, 200 Fed. Appx. 25, 27 (2d Cir. 2006) ("'Even where a Rule 56([d]) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered' – that is, a mere fishing expedition.").

Moreover, "a party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Lynch v. Brennan*, No. 15 Civ. 2479, 2017 WL 3309747, *6 (S.D.N.Y. Aug. 2, 2017) (quoting *Scott v. Koenigsmann*, No. 12-CV-1551, 2016 WL 1057051, at *9 (N.D.N.Y. March 14, 2016)); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 796 F.2d 919, 927-28 (2d Cir. 1985) ("[W]hen alerted to a forthcoming motion for summary judgment, a party wanting more time for discovery should seek, through negotiation with the other party and, if necessary, through application to the district court, an appropriate discovery schedule. A party who

both fails to use the time available and takes no steps to seek more time until after a summary judgment has been filed need not be allowed more time for discovery absent a strong showing of need.").

Markets asserts that the declaration of its CFO, Timothy J. Raleigh, submitted in conjunction with its opposition brief (Dkt. 67 (the "Raleigh Decl.")) constitutes the "affidavit" required to properly request additional discovery in the face of summary judgment. (Markets' Memorandum of Law in Opposition ("Opp.") at 19.) Raleigh asserts that Markets served "reasonably limited" post-deposition discovery requests, attaches a copy of them, and states that the requests "were designed to pin [Defendant] down on" which customers were allegedly solicited during the one-year period at issue. (Raleigh Decl. ¶¶ 31, 34.) It goes on to assert that these post-deposition discovery requests were necessary in light of "Oliveira's stonewalling and withholding of documents," which "prevented [Markets] from gathering all the information needed to make out [a] 'lost profits' analysis." (Raleigh Decl. ¶ 33.)

While Raleigh's Declaration satisfies some of Rule 56(d)'s requirements, it fails to make the "strong showing of need" required where the parties have already had the opportunity to pursue discovery, leaving Markets' bid for additional discovery and delay of summary judgment deficient. By its own admission, Markets has sought the discovery requested in its interrogatories since the outset of the litigation and has had numerous opportunities to compel its production. (*See* Opp. at 20 (admitting that Markets sought out the information requested in its interrogatories in a "comprehensive discovery request" served "at the outset of the litigation"); Dkt. 33, 34 (letters from Markets' counsel regarding the production of the same materials requested by the instant interrogatories).) Indeed,

on January 29, 2019, the undersigned issued an order requiring Oliveira to produce, by February 6, 2019, "all communications with the entities listed on 'Exhibit A' of Markets' requests for the designated year's time" and called for the parties to contact this Court if another unresolvable dispute arose over these materials. (Dkt. 38.) No such contact was made.

Instead, Markets proceeded to depose Oliveira on March 14, 2019. During that deposition, Markets had every opportunity to ask Defendant, under oath, for the information it now seeks via interrogatory. Markets fails to point this Court to any instances in which it did so. In the forty-six days between Oliveira's March 14, 2019 deposition and his April 29, 2019 motion for summary judgment, Markets could have sought leave from the undersigned, to whom the case was referred early on for general pretrial management (Dkt. 10), to seek or receive discovery following the fact discovery deadline. Markets did not do so. Instead, on April 5, 2019, Markets submitted a letter addressed to Judge Woods seeking leave to pursue the discovery at issue. (Dkt. 42.) Judge Woods denied the request without prejudice, directing Markets to raise this issue with the undersigned as it should have done. (Dkt. 43.) Markets did not do so. Had this discovery been so relevant to the instant motion that it warranted relief under Rule 56(d), Markets could have – and should have – brought it to this Court's attention well in advance of Oliveira's filing its motion for summary judgment.

Markets argues that it requires discovery following the conclusion of fact discovery and following the filing of a motion for summary judgment because "to date [Oliveira] had successfully flouted discovery rules" and attributes "the delay" in serving these requests to "[Oliveira] running out the clock with his delays and prevarications." (Raleigh Decl. ¶¶

28, 34.)  But it is Markets' own delinquency – not Oliveira's – that compels this Court to deny its request for relief under Rule 56(d).[3]  Accordingly, this Court will proceed to the merits of Oliveira's motion.

**B.  Markets' Misappropriation of Trade Secrets Claim Should Be Dismissed**

The Complaint alleges that Oliveira misappropriated trade secrets as Oliveira had access to Markets' customer lists – described as one of Markets' "valuable trade secrets" – and "used such lists after his departure from Plaintiff in breach of an explicit Employment Agreement containing duties of confidentiality and non-competition and for his own gain." (Complaint ¶¶ 26-27.)

Oliveira proffers two arguments for dismissal of this claim: (1) Markets' customer lists were not trade secrets warranting protection; and (2) Markets failed to produce any admissible evidence showing that Oliveira "made physical or electronic copies of these lists, downloaded these lists to his personal email, or copied these lists to any device." (Memorandum of Law in Support of Motion for Summary Judgment ("Motion") (Dkt. 55) at 19.)  Oliveira is correct on both counts.  For the reasons stated below, the Court recommends that Oliveira's motion for summary judgment dismissing Markets' misappropriation of trade secrets claim be granted.

---

[3] The cases cited by Markets in support of its argument for relief under Rule 56(d) do not dictate a different result.  In *Seneca Beverage Corp.*, the Second Circuit reversed the district court's refusal to grant relief under Rule 56(d) where parties had not been afforded the opportunity to seek any discovery (let alone months of document discovery and depositions), while in *Brown v. City of Syracuse*, the Second Circuit did the same where the party seeking summary judgment had repeatedly failed to comply with discovery orders issued by the district court.  *See Seneca Beverage Corp.*, 200 Fed. App'x at 28; *Brown v. City of Syracuse*, 197 Fed. App'x 22, 26 (2d Cir. 2006).  Plaintiff's conclusory allegation that Defendant has "successfully flouted discovery rules" (Raleigh Decl. ¶ 34) does not make a similar showing.

"A plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (internal citations and quotation marks omitted). "'Improper means' generally refer to 'means which fall below the generally accepted standards of commercial morality and reasonable conduct." *Insurent Agency Corp. v. Hanover Insurance Co.*, No. 16 Civ. 3076, 2018 WL 3979589, *3 (S.D.N.Y. 2018) (quoting *Bancorp Services, LLC v. American General Life Insurance Co.*, No. 14 Civ. 9687, 2016 WL 4916969, *11 (S.D.N.Y. Feb. 11, 2016)). The Court addresses each element in turn.

### 1. Markets' Customer Lists Are Not Trade Secrets

"A trade secret is defined as 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" *Locke v. Tom James Co.*, No. 11 Civ. 2961, 2013 WL 1340841, *7 (S.D.N.Y. March 25, 2013) (quoting *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395 (N.Y. 1993)). A trade secret is "not simply information as to single or ephemeral events in the conduct of business; rather, it is a process or device for continuous use in the operation of the business." *Sofitel, Inc. v. Dragon Medical and Scientific Communications*, 118 F.3d 955, 968 (2d Cir. 1997). New York courts examine several factors in determining whether information rises to the level of a trade secret, including:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount

of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999); *see also* Restatement of Torts § 757, cmt. b (defining "trade secret").

It is well established that "where the employer's past or prospective customers' names are readily ascertainable from sources outside its business, trade secret protection will not attach and their solicitation by the employee will not be enjoined." *Aqualife Inc.*, 50 Misc.3d 1206(A) at *6 (quoting *Columbia Ribbon & Carbon Manufacturing Co. v. A-1-A Corp.*, 42 N.Y. 2d 496, 499 (1977)); *Poller*, 974 F. Supp. 2d at 215 ("a former employee may not be enjoined from soliciting his or her former employer's customers where the names and addresses of potential customers are readily discoverable through public sources") (quoting *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 557 (E.D.N.Y. 1995); *Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) ("A customer list is not confidential where the past or prospective customers are 'readily ascertainable' from nonconfidential sources outside the employer's business."); *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 195 (N.D.N.Y. 2005) (noting that customer information "did not possess the attributes of a trade secret" where it was "readily ascertainable" and could "be generated from publicly available sources including the Internet, Yellow Pages, and the membership lists of various professional organizations providing services in those areas").

That said, even though some information contained in a customer list may be publicly available, "where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time

and money, the names of those customers are protectable trade secrets." *Tactica International, Inc. v. Atlantic Horizon International, Inc.*, 154 F. Supp. 2d 586, 606 (S.D.N.Y. 2001) (quoting *Ivy Mar Co.*, 907 F. Supp. at 556-57); *see also North Atlantic Instruments, Inc.*, 188 F.3d at 46 ("Numerous cases applying New York law have held that where . . . it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."); *Stanley Tulchin Associates, Inc. v. Vignola*, 186 A.D.2d 183, 185-86 (2d Dep't 1992) (finding overbroad restrictive covenant enforceable only over employer's client lists as they contained "information relating to clients that [was] not readily known in the trade and that [was] discoverable only through effort.").

This comports with the Second Circuit's conclusion that a "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (internal citations and quotations omitted). Accordingly, "the *sine qua non* of whether a customer list constitutes a trade secret lies in whether the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, or, by contrast, the customers are not known in the trade or are discoverable only by extraordinary efforts and the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money." *Poller*, 974 F. Supp. 2d at 216.

Oliveira argues that Markets' customer lists cannot be considered trade secrets because they are derived from publicly available information. In support, Oliveira cites to the deposition testimonies of Markets' CFO and CEO describing the information included in these customer lists and the sources for that data. (Motion at 12.) As that testimony shows, Markets primarily collected its data by conducting and reviewing searches on Google and LinkedIn, both of which are accessible by the general public. (*Id.*) To supplement the data collected on Google and LinkedIn, Markets encouraged its employees to procure attendee lists for competing events. (*Id.*) While some of these lists were publicly available, Markets also offered its employees cash bonuses for each competitor list obtained. (*Id.*)

Markets argues in response that these customer lists – compiled with information sourced from Google, LinkedIn, and competitor data – also contained "nonpublic information" that took "effort" to obtain, which made them protectable trade secrets. (Opp. at 8-9, 17.) According to Markets, Oliveira "acquired substantial nonpublic information about . . . prospects, such as their job descriptions, levels of spending authority, role in acquiring products like [Markets'], ability to travel, general level of interest in attending, and types of events they found most appealing, and similar events they attended in the past, as well as their own hobbies and sports, and other non-public information which facilitated 'closing' them as customers." (Opp. at 8-9.) Markets also references Raleigh's Declaration, which describes the "methods of searching the Internet" that Markets had developed to target potential individuals "who are particularly likely to be interested in purchasing [Markets'] product" and states that Markets "trained [Oliveira] to talk to these people and obtain nonpublic information" from them. Markets asserts that Oliveira "was

trained to store all this information (and did so store it) in an Excel spreadsheet." (Opp. at 9; *see also* Raleigh Decl. ¶¶ 16 ("We required Oliveira to keep the nonpublic information he acquired in excel spreadsheets.")). But Markets does not point to a single customer list that contains the "nonpublic information" referenced in Markets' arguments, relying only on Raleigh's testimony to support its contentions.

The Court must disregard, however, Raleigh's statements regarding the content of Markets' customer lists – made both during his deposition and in his Declaration – as they violate the best evidence rule and are therefore not admissible. Federal Rule of Evidence 1002 provides that "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Oliveira requested production of "[a]ll customer and/or client lists utilized by Plaintiff during Defendant's tenure with [Plaintiff]" in its first request for production dated June 13, 2018. (Dkt. 19-2 ¶ 10; *see also* Dkt. 21-2 ¶ 10.) And, while the parties raised several discovery disputes before this Court, Markets has never contended that these documents were unavailable (as would permit reliance on evidence other than the documents themselves).[4]

Accordingly, the customer lists already produced by Markets – which, based on the record before this Court, do *not* contain nonpublic, customer-specific data – remain the best evidence of their respective contents, and Raleigh's unsupported contentions

---

[4] Federal Rule of Evidence 1004 ("Rule 1004") enumerates the limited circumstances in which an "original" (as defined by Federal Rule of Evidence 1001(d) as "the writing or recording itself" or, for electronically stored information, "any printout – or other output readable by sight – if it accurately reflects the information") is unnecessary. Fed R. Evid. 1004; Fed. R. Evid. 1001(d). None of those circumstances exist here.

that Markets' customer lists contained more detailed information will be disregarded. *See New York ex rel. Spitzer v. Saint Francis Hospital*, 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000) (striking portions of an affidavit proffered in support of a motion for summary judgment that commented on the contents of letter correspondence because "the letters themselves [were] the best evidence of their contents"); *Trustees of the Pavers and Road Builders District Council Welfare v. M.C. Landscape Group, Inc.*, No. 12 CV 0834, 2015 WL 12644526, \*21 (E.D.N.Y. Oct. 16, 2015) (disregarding declaration submitted in support of summary judgment motion stating that non-produced "books and records" created a genuine issue of material fact about the accuracy of other probative documents as the documents themselves were the best evidence of their contents); *Gaft v. Mitsubishi Motor Credit of America*, No. 07 Civ. 527, 2009 WL 3148764, \*4 (E.D.N.Y. Sept. 29, 2009) (disregarding portions of affidavit submitted in support of summary judgment motion describing the contents of a report as such statements were barred by the best evidence rule).

In light of the admissible evidence presented, this Court concludes that there is no genuine issue of fact as to whether Markets' customer lists contained anything other than "readily ascertainable" information that does not warrant trade secret protection. While the Court acknowledges that it takes effort to collect the information at issue from LinkedIn and Google, Markets has made no showing that its employees transformed the information they collected from the public domain into confidential trade secrets. Accordingly, in the eyes of this Court, Markets' customer lists are nothing but condensed sets of data that anyone with Internet access could compile and cannot be considered trade secrets.

Review of the other factors examined by New York courts in determining whether information should be considered a protectable "trade secret" supports this conclusion. First, Markets has acknowledged that the majority of its employees work on supplementing its customer lists and, accordingly, had ready access to them. (*See* TJR Depo. at 79:4-7 ("the vast majority of our data comes from our mining; like I said, two thirds of our staff approximately do this for, you know, their portion of the day every day"); *Id.* at 82:2-8 (when asked how many people were responsible for compiling customer lists, responding "it's about two-thirds of the staff, so at any given time, whatever the total roster is, it's approximately two-thirds of that; it would be anybody in the IR position.").) Second, Markets made few efforts (outside of the covenants in the Letter Agreement at issue here) to secure its customer lists, even with the knowledge that it encouraged employees to secure similar lists from its competitors' employees. (*See* TJR Depo. at 28:5-8 (when asked how the "buy-side data" was secured, responding that "it was the responsibility of the manager to ensure that it only goes to people who need it and to be the gatekeeper of that data."); *Id.* at 228:16-23 (when asked whether there were any security measures to prevent employees from removing a customer list from Markets' database, responding "[n]ot from doing it that way."))

Without identifying a protectable trade secret, Plaintiff cannot sustain a claim for misappropriation of trade secrets under New York law. *See Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292, 2008 WL 463884, *9-10 (S.D.N.Y. Feb. 20, 2008) (granting summary judgment dismissing claim for misappropriation of trade secrets where plaintiff claimed that its "overarching business method" warranted protection, but failed to "demonstrate[ ] the way in which the various components fit together as building blocks

in order to form the unique whole" and thus did not raise "a triable issue of fact as to its unique combination") (internal citations and quotation marks omitted); *Detsis v. Victoria's Secret Stores, Inc.*, No. 03 Civ. 5358, 2006 WL 2819586, *5-6 (S.D.N.Y. Sept. 29, 2006) (granting summary judgment dismissing claim for misappropriation of trade secrets where "the ideas that defendant allegedly misappropriated do not constitute trade secrets under . . . the common law in New York"); *Frink America, Inc. v. Champion Road Machinery Ltd.*, 48 F. Supp. 2d 198, 206 (N.D.N.Y. 1999) (granting summary judgment dismissing claim for misappropriation of trade secrets where "plaintiff failed to satisfy its burden of proof that the process or equipment used" in manufacturing its product "was significantly distinctive or secret as to merit trade secrecy protection"). For this reason alone, the misappropriation claim should be dismissed.

### 2. Markets Points to No Evidence that Oliveira Possessed or Used its Trade Secrets

Even if Plaintiff's customer lists did constitute protectable trade secrets under New York law, its misappropriation of trade secrets claim still fails as Markets does not point to any admissible evidence to counter Oliveira's statements that he did not actually possess or use the information that Markets contends constitutes trade secrets.

Regarding possession, Oliveira asserts that he did not "remove[] [Markets'] 'customer lists' or other data, or download[] [Markets'] 'customer lists' or other data to my personal email, computer, or any other personal electronic device." (Oliveira Decl. ¶ 17.) Markets responds with the following arguments: (1) Oliveira's recollection of the information contained on Markets' customer lists is sufficient to show that he possessed

Markets' trade secrets;[5] and (2) Oliveira's use of his personal cell phone to send emails while under Markets' employ demonstrates that he possessed Markets' trade secrets.[6] Neither argument, however, creates a question of fact.

It is undisputed that Oliveira used his personal cell phone "to send emails, which included [Markets'] data and 'customer information.'" (Oliveira Decl. ¶ 16; *see also* Oliveira Depo. at 115:10-15 (testifying that he worked from home by "maybe answer[ing] e-mail on [his] phone"); 116:6-17 (testifying that, upon becoming a full-time employee, Markets required that e-mail be downloaded to personal phone).) However, Oliveira affirms that he "never removed [Markets'] 'customer lists' or other data, or downloaded [Markets'] 'customer lists' or other data to [his] personal email, computer or any personal electronic device" and testified that he did not "save any information to a thumb drive, BSD or other device" or "e-mail any information to [him]self."[7] (Oliveira Decl. ¶ 17; Oliveira Depo. 117:9-15.) Markets does not cite any admissible evidence to contradict Oliveira's

_____

[5] *See* Opp. at 9 ("Defendant also had in memory the names of customers with whom he had spoken while in Plaintiff's employ and nonpublic information about them."); Raleigh Decl. ¶ 26 ("[T]o the extent [Oliveira] is asserting that an actual list of client information is necessary proof of a violation of our nonsolicitation clause, that is simply untrue. A normal human memory would contain sufficient nonpublic information about hundreds of the customers he had spoken to on our behalf to give Oliveira a competitive advantage. A trade secret need not be written down.").

[6] *See* Opp. at 9 ("As of the date he resigned, Defendant by his own admission had information in his personal cell phone relating to Plaintiff's customers."); Raleigh Decl. ¶ 25 ("Oliveira's claim that he never took any data from us is contradicted by his own assertion that client contact information and emails resided on his cell-phone.")

[7] Indeed, Markets' CFO testified at deposition that there was no electronic evidence of Oliveira taking customer lists from Markets, though Markets' CFO alleged that Oliveira "was around when other people e-mailed data to themselves and would have known exactly how to get around that" (TJR Depo. at 225:24-25, 226:2-7) But Plaintiff presents no evidence that Defendant did so.

statements, instead resting on its unsupported assumptions that the emails sent from Oliveira's phone remain on his phone and that those emails contained Markets' trade secrets.  (*See* Opp. at 9 ("Defendant by his own admission had information in his personal cell phone relating to Plaintiff's customers."); Raleigh Decl. ¶ 25 ("Oliveira's claim that he never took any data from [Markets] is contradicted by his own assertion that client contact information and emails resided on his cell phone.").)

Even if Markets had presented evidence that Oliveira retained its customer lists after leaving its employ, it still offers no admissible evidence to support the assertion that he used them.  Oliveira affirms that "since [he] did not have a hard copy or electronic copies of [Markets'] 'customer lists' or other data in [his] possession or control, we did not use [Markets'] 'customer lists' or other data to build lists of names and contact information for the May 2018 event or any other event" and contends that Markets' "sole support for misappropriation is its CEO's 'personal belief' that . . . Oliveira could not create a customer list alone."  (Oliveira Decl. ¶ 25; Motion at 5, 19.)  Markets again offers no admissible evidence in response.

Without evidence of actual use, Markets has no sustainable misappropriation claim.  *See Poller*, 974 F. Supp. 2d at 234-35 (granting summary judgment dismissing claims for misappropriation of trade secrets where there was "no indication from the record that [third-party defendant] misappropriated any of [claimant's] proprietary information"); *Sit-Up Ltd.*, 2008 WL 463884 at *13 (granting summary judgment dismissing claims for misappropriation of trade secrets where plaintiff failed to present a triable issue of fact as to whether defendant used the trade secrets at issue); *Alpha Media Works, Inc. v. Perception Research Services, Inc.*, No. 09 Civ. 9563, 2012 WL 406914,

*4 (S.D.N.Y. Feb. 9, 2012) (granting summary judgment dismissing claims for misappropriation of trade secrets where the sole evidence proffered in support of plaintiff's claim was the allegation that "a former salesman for [Plaintiff] who then went to work for [Defendant] . . . on information and belief stole our proprietary information and distributed it to [Defendant]"); *Waterville Inv., Inc. v. Homeland Security Network, Inc.*, No. 08 Civ. 3433, 2010 WL 2695287, *5 (E.D.N.Y. July 2, 2010) (granting summary judgment dismissing claims for misappropriation of trade secrets where defendants asserted that they did not use any of the alleged trade secrets at issue and plaintiff failed to "point to any evidence in the record which controvert[ed] defendants' evidence").

Accordingly, summary judgment should be granted in favor of Oliveira dismissing Markets' claim for misappropriation of trade secrets.

## C.     The Breach of Contract Claims Should Be Dismissed

Markets further alleges that Defendant breached the Letter Agreement by: (1) "using Plaintiff's confidential and proprietary information, such as client lists, to solicit real estate event business for himself from the clients contained on such lists"; and (2) "competing with Plaintiff by engaging in business activities directly in competition with Plaintiff's real estate forum business activities."  (Complaint ¶ 16.)  While Markets does not tie the alleged breaches to specific provisions of the Letter Agreement, it highlights the following sections of the Letter Agreement when describing the covenants that Oliveira made upon signing:  (1) the "Duty of Confidentiality"; (2) "Company Documents"; (3) "Non-Solicitation of Clients and Contacts"; and (4) "Non-Competition."  (Complaint ¶¶ 11-14.)

Oliveira argues that Markets' breach of contract claims should be dismissed for a number of reasons.  First, Oliveira argues that the non-competition and non-solicitation clauses at issue are unenforceable as a matter of law.  (*Id.*)  Second, Oliveira argues that the information at issue is not "confidential, proprietary, or a trade secret" and use of such information, if any, could not have breached Letter Agreement.  (*Id.*)  Third, Oliveira argues that Markets' damages calculations are "completely speculative," that Markets lacks evidence of damages, and that any allegations for "lost profits" damages should be ignored because the parties did not agree to lost profits damages in the Letter Agreement.  (*Id.*)  For the reasons outlined below, the Court agrees with Oliveira.

### 1.    Enforceability of the Non-Solicitation and Non-Competition Clauses

As a general rule, "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 214 (S.D.N.Y. 2013) (quoting *Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 371 (S.D.N.Y. 2009)).  The New York Court of Appeals has held that "specific enforcement of a restrictive covenant is appropriate only if the covenant is: (1) necessary to protect the employer's legitimate interests; (2) reasonable in time and area; (3) not unreasonably burdensome to the employee; and (4) not harmful to the general public." *Silipos, Inc v. Bickel*, No. 06 Civ. 2205, 2019 WL 2265055, *3 (S.D.N.Y. August 8, 2006) (citing *BDO Seidman v. Hirschberg*, 93 N.Y.2d 382, 388-89 (1999)); *see also Reed, Roberts Associates v. Strauman*, 40 N.Y.2d 303, 307 (1976) ("a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in

time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.")  The Court addresses each of these factors below.

### a. Legitimate Interests of the Employer

"Employer interests that may justify specific enforcement of a restrictive covenant are limited to: (1) protection of trade secrets; (2) protection of confidential customer information; (3) protection of an employer's client base; and (4) protection against irreparable harm where an employee's services are unique or extraordinary."  *Poller*, 974 F. Supp. 2d at 215 (citing *Ken J. Pezrow Corp. v. Seifert*, 197 A.D.2d 856-57 (4th Dep't 1993)).  Indeed, courts have held that the "law of [New York], as enunciated by its highest court, is that a nonsolicitation covenant will not be enforced absent trade secrets or other special circumstance."  *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 404 (2d Dep't 1983) (citing *Reed, Roberts Associates*, 40 N.Y.2d at 308); *see also Aqualife Inc. v. Leibzon*, 50 Misc.3d 1206(A) (Sup. Ct., Kings Cty. 2016) ("restrictive covenants are disfavored by the courts and are enforceable 'only to the extent necessary to protect the employer from unfair competition which steps from the employee's use or disclosure of trade secrets or confidential customer lists'") (internal quotations and citations omitted).

While not stated so succinctly in its opposition papers, Markets essentially contends that the non-compete and non-solicitation clauses of the Letter Agreement properly protect its "trade secrets" (i.e., its customer lists).  This Court disagrees.  As discussed in detail above, Markets' customer lists are not trade secrets and, accordingly, do not warrant protection by restrictive covenants.  As Markets presents no other

"legitimate interests" protected by these restrictive covenants, they should not be enforced.

### b.    Reasonableness in Scope

Addressing the second enforceability factor, Oliveira argues that the restrictive covenants at issue are unenforceable because they "contained no geographical limit" and thus imposed an undue burden on his ability to work.[8]  (Motion at 8.)  Markets does not dispute Oliveira's contention that the restrictive covenants lacked a geographical limitation, but counters that "a nonsolicitation clause is subject to no such requirement." (Opp. at 14.)  Although Markets correctly notes that courts have enforced restrictive covenants that did not contain an explicit geographic limitation, the Court does not agree that the restrictive covenants at issue should be treated similarly.  (*Id.*)

"It is axiomatic . . . that non-compete clauses and non-solicitation provisions, even where protecting legitimate interests, must be reasonably limited both temporally and geographically in order to withstand judicial scrutiny, as reasonableness will not be found where restrictive covenants act to unreasonably limit trade and burden an individual's livelihood."  *Poller*, 974 F. Supp. 2d at 220; *see also Ticor Title Insurance Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("The issue of whether a restrictive covenant not to compete is enforceable by way of an injunction depends in the first place upon whether the covenant is reasonable in time and geographic area."); *Reed, Roberts Associates*, 40 N.Y. 2d at 307 (restrictive covenants will be enforced only if "reasonable in time and area").

---

[8] Oliveira does not argue that the 12-month temporal restrictions in the non-competition and non-solicitation clauses are unreasonable.  Accordingly, the Court does not further discuss the temporal reach of the restrictive covenants.

Courts have repeatedly refused to uphold a restrictive covenant that effectively precludes an employee from working in his chosen profession "anywhere in the world." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (finding a non-compete provision unreasonable and unenforceable where it failed to provide for any geographic limitations and where employer failed to produce evidence showing that a covenant "restricting competition . . . anywhere in the world" was reasonable in scope); *Jay's Custom Stringing, Inc v. Yu*, No. 01 Civ. 1960, 2001 WL 761067, *7 (S.D.N.Y. July 6, 2001) (refusing to uphold non-competition clause that, among other things, precluded employee from working "anywhere on earth" in his profession for two years); *Aqualife, Inc.*, 50 Misc. 3d 1206(A) at *5 (declining to uphold restrictive covenants that contained "no geographical limit whatsoever" and "appl[ied] to the entire country and even other countries in the world" as they were "necessarily greater than required to protect any conceivable legitimate interest of plaintiff").

Other courts nevertheless have upheld restrictive covenants that did not contain geographic limitations because they contained client-based restrictions that effectively limited their scope. *See, e.g., Marsh USA Inc. v. Karasaki*, No. 08 Civ. 4195, 2008 WL 4478239, *3, 16 (S.D.N.Y. Sept. 2, 2011) (upholding non-solicitation clause that lacked geographic limitation, but only forbade solicitation of "clients or prospects of the Company . . . who were solicited or serviced directly by [Defendant] or where [Defendant] supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects").

Indeed, Markets cites many cases that reach this conclusion when evaluating the enforceability of restrictive covenants with similar, client-based restrictions. *See, e.g. IT*

*Techstop, Inc v. Amidon*, No. 5815-11, 2011 N.Y. Misc. LEXIS 4500, *2-3 (Sup. Ct. Albany Cty. Sept. 21, 2011) (enforcing restrictive covenant that prohibited defendant employee from soliciting or performing services that could be rendered by plaintiff employer for Plaintiff's "relatively small customer base" of approximately 15, which left defendant employee free to perform similar services "for the vast number of firms that were not Plaintiff's customers"); *Crest Hill Capital LLC v.* Gonzalez, 2019 N.Y. Misc. LEXIS 1780, *9, 16-17 (Sup. Ct. New York Cty, April 2, 2019) (finding restrictive covenants that prohibited defendant employee from "solicit[ing] clients" and from "from encouraging, directly or indirectly, any disruption or cessation of relationship and business between [Plaintiff] and . . . a current, former, or prospective client" valid and enforceable because it was "client-based").[9]

The New York Court of Appeals has confirmed, however, that a restrictive covenant that centers its limitations on the employer's customers can still be overbroad. In *BDO Seidman*, the court examined the enforceability of a contractual clause that required an employee to pay its former employer if he "served any former client of [its] Buffalo office" within 18 months after leaving its employ. 93 N.Y.2d at 387. While the court noted that an "employer has a legitimate interest in preventing former employees

---

[9] Plaintiff also cites *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398 (2d Dep't 1983) and *DAR Associates, Inc. v. Uniforce Services, Inc.*, 37 F. Supp. 2d 192 (E.D.N.Y. 1999) in support of its argument that restrictive covenants in employment agreements that lack geographic limitations are not *per se* unenforceable. Neither case supports that argument. In *Greenwich Mills*, the Second Department evaluated whether the restrictive covenants at issue could be enforced without evidence that the defendants were privy to trade secrets (they could not). 37 F. Supp. 2d at 404-05. In *DAR Associates*, the Eastern District of New York evaluated the enforceability of restrictive covenants contained in a licensing agreement, which are subject to an entirely different standard than restrictive covenants in employment agreements.

from exploiting or appropriating the goodwill of a client or customer which had been created and maintained at the employer's expense," it found the restrictive covenant "greater than . . . needed to protect" that legitimate interest to the extent it applied to "clients with whom a relationship with [the employee] did not develop through assignments to perform direct, substantive" work. *Id.* at 391-92. Similarly, in *Brown & Brown, Inc. v. Johnson* the court concluded that a non-solicitation provision precluding an employee from "directly or indirectly soliciting, accepting or servicing . . . a customer or account" of the employer's New York offices was overbroad and unenforceable "to the extent that it prohibited [employee] from working with *any* of plaintiff's New York customers, even those [employee] had never met, did not know about, and for whom she had done no work." 25 N.Y.3d 364, 370-71 (2015).

The restrictive covenants at issue here are similarly overbroad, notwithstanding client-based, limitations. The non-compete provision forbids Oliveira from "directly or indirectly render[ing] any service, assistance, or advice related to the duties [he] performed for the [Plaintiff] . . . to any business, person, or entity which is in competition with the employer." (Dkt. 61-3 at 5.) But the Letter Agreement does not define what it means to be "in competition" with Markets. Although the Court acknowledges Markets' argument that the term "competition" is a "plain English term[] not requiring a definition within the contract," neither Markets' CEO nor its CFO could identify the scope of persons or entities that constituted its "competitors."[10] Without providing a clear understanding of

---

[10] *See* TJR Depo. at 67:12-19 (when asked how many competitors Plaintiff has, stating "it's a hard question to answer, because what constitutes a competitor? You know, is it somebody who is doing very similar events? Is it somebody who's just organizing events? Is it somebody who's organizing events that might draw the same types of targets? . . .

the persons or entities that constitute Markets' competitors or imposing any geographic limitations, enforcement of the non-compete covenant would effectively rob Oliveira of the ability to work in his chosen field for a year, a result strongly disfavored under New York law. *See Columbia Ribbon*, 42 N.Y.2d at 499 ("Since there are 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood' . . . restrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law.").

Similarly, the non-solicitation clause prohibits Oliveira from "directly or indirectly (1) solicit[ing] the business of or perform any services for any Client of the Employer . . . or (2) attempt[ing] to induce any *client of the Employer* to terminate, change, reduce, or to not extend an affiliation with the Employer . . . that exists at the time of cessation of your employment." (Dkt. 61-3 at 4-5.) "Client of the Employer" is defined as "any actual or prospective client of the Employer (i) for whom [Oliveira] performed services; or (ii) *whose Confidential and Proprietary information [Oliveira] had access to during the course of [Oliveira's] employment with the Employer.*" (*Id.*) (emphasis added.) Oliveira contends that enforcement of the non-solicitation provision would thus prohibit him from soliciting or performing services for "thousands of investors, sponsors, delegates, speakers, investment companies, suppliers, and vendors," at least some of whom he had never met, did not know about, and for whom he did no work. (Motion at 10.) Markets does not contest Oliveira's interpretation of the scope of the non-solicitation clause, responding

---

It's a very vague and general question."); AJR Depo. at 147:2-17 (stating that he "couldn't give . . . a specific number" when asked how many competitors Plaintiff has).

only that "[t]he clause . . . is enforceable under New York law."[11] (Opp. at 18.) Markets is incorrect. As discussed above, the Court of Appeals has repeatedly refused to enforce restrictive covenants that precluded the subject employee from soliciting customers with whom that employee had not worked. *See Brown & Brown, Inc.*, 25 N.Y.3d at 370-71; *BDO Seidman*, 93 N.Y.2d at 392. As Markets has provided no issue of fact as to the breadth of the non-solicitation clause at issue, this Court must do the same.

Accordingly, the Court recommends that Plaintiff's breach of contract claims be dismissed.[12]

---

[11] Markets also argues that the enforceability of restrictive covenants is a matter that should be reserved for a trier of fact as it "involve[es] fact issues not suitable for disposition on a motion for summary judgment." (Opposition at 18.) While summary judgment was, in fact, denied in each of the cases Plaintiff cites, none stands for the broad proposition that Plaintiff makes and all are distinguishable from the instant matter. *See Greenwich Mills*, 91 A.D.2d at 405-06 (affirming denial of summary judgment where the Second Department concluded that defendants had shown "a sufficient allegation of trade secrets to defeat the motion"); *Greystone Funding Corp. v. Kutner*, 137 A.D.3d 427, 427-28 (reversing grant of summary judgment where an issue of fact existed as to whether defendant employee was terminated with cause and where issues of fact existed as to the reasonableness and enforceability of the restrictive covenants at issue); *National Financial Partners*, 145 A.D.3d at 440-41 (affirming denial of summary judgment for claims of tortious interference of certain management and merger agreements between the parties). Indeed, the New York Court of Appeals has evaluated and affirmed grants of summary judgment regarding the enforceability of restrictive covenants. *See, e.g., Columbia Ribbon*, 42 N.Y.2d at 499-500 (affirming grant of summary judgment finding restrictive covenants in an employment agreement that "d[id] no more than baldly restrain competition" unenforceable).

[12] As an additional ground for dismissal, Oliveira contends that Markets has not presented evidence sufficient to demonstrate damages with reasonable certainty. (See Motion at 14-18.) While Oliveira may well be correct, the Court sees no need to address the issue given that summary judgment is warranted on the merits of both the trade secret and contract claims.

**Conclusion**

For the foregoing reasons, I recommend that Defendant's motion for summary judgment be GRANTED in its entirety. The parties' remaining arguments, to the extent not addressed herein, have been considered by the Court and found to be without merit. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Gregory H. Woods, at United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      February 3, 2020
            New York, New York